UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WINDSOR COLEMAN,

        Plaintiff,

     v.                                                            24-CV-6182-MAV
                                                                        ORDER
JULIE WOLCOTT, WILLIAM
TOMPOROWKSI, JOHN DOE/MR.H.,
ANTHONY ANNUCCI, DANIEL
MARTUSCELLO, III, FIVE POINTS
CORRECTIONAL FACILITY
SUPERINTENDENT JOHN DOE,
ANTHONY RODRIGUEZ, C.O. EBERT,
C.O. CORNMILLER, C.O. FORD,
JOSEPH NOETH, SORC
LITTLEJOHN, ANNE MARIE
MCGRATH, CHAD FREDERICKSON,
CYNTHIA KAHN, LAKEVIEW
CORRECTIONAL FACILITY
SUPERINTENDENT KUBIK,
MIDDLEBROOK, GEORGE POFF,
C.O. FITSHANS, D.S.S.
STACKOWSKI, D.S.S. RACZKOWSKI,
NEW YORK STATE DEPARTMENT
OF CORRECTIONS AND
COMMUNITY SUPERVISION, NEW
YORK STATE DEPARTMENT OF
MENTAL HEALTH SERVICE, NEW
YORK STATE ATTORNEY
GENERALS ENTITY/OFFICE, NEW
YORK STATE GOVERNOR
ENTITY/OFFICE, AND JOHN DOE ##
3, 5, 6, 7, 8, 9, 10,[1]

        Defendants.

_____

[1] The Clerk of Court is directed to amend the caption as it appears above. The caption includes only those defendants identified in the second amended complaint, ECF No. 118-11, who are connected to correctional facilities located in this District.

## INTRODUCTION

*Pro se* plaintiff, Windsor Coleman, a prisoner at Midstate Correctional Facility ("Midstate"), initially filed an action in the Northern District of New York, *Santos et al. v. Parmitel et al.*, 9:23-CV-401-GTS-TWD ("Northern District Action"); seeking relief under 42 U.S.C. § 1983. ECF No. 1. He also filed an application to proceed *in forma pauperis*, which was granted. ECF Nos. 7, 10. After Coleman filed an amended complaint, ECF No. 14, the Northern District Court severed Defendants William Tomporowski ("Tomporowski"),[2] Attica Superintendent Julie Wolcott ("Wolcott"), and John Doe/Mr. H, as well as all claims against them, and transferred these Defendants and claims to this Court. ECF No. 36. Upon receipt of the transfer, the Clerk's Office opened this case ("24-CV-6182"). ECF No. 37.

On June 7, 2024, Coleman filed a second amended complaint in the Northern District Action. Shortly thereafter, the Northern District severed defendants Anthony Annucci ("Annucci") and Daniel Martuscello III ("Martuscello") and all claims against them and transferred them to this District. Upon receipt of the transfer, the Clerk's Office opened case number 6:24-CV-6388-FPG ("24-CV-6388"), ECF Nos. 45, 46.

The Court consolidated cases 24-CV-06388 (now closed) and 24-CV-6182 (lead case). ECF No. 61. The second amended complaint in 24-CV-6388 was docketed as the second supplement to the amended complaint in this action. ECF No. 14-3.

---

[2] In the second amended complaint he is identified as W. Tomprowski, but the *Valentin* response, ECF No. 114, identifies him as William Tomporowski.

Pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), the Court screened the amended complaint, ECF No. 14, as supplemented, ECF Nos. 14-2 and 14-3, (collectively, the "amended complaint"), and permitted Coleman's Eighth Amendment claims against Tomporowski and Annucci arising from his SHU confinement to proceed to service. ECF No. 112 ("initial screening order"). Coleman was permitted to file a second amended complaint concerning violations of his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments arising from events which occurred at Attica Correctional Facility ("Attica"), Lakeview Shock Incarceration Correctional Facility ("Lakeview"), and Wende Correctional Facility ("Wende").

Coleman has since filed a 321-paragraph second amended complaint (captioned amended complaint) (ECF No. 118-11) with nearly 700 pages of attachments (ECF Nos. 118-1–18-10) [3] against 66 named Defendants, spanning events at Clinton Correctional Facility ("Clinton"), Midstate, Green Haven Correctional Facility ("Green Haven"), Attica, Lakeview, and Five Points Correctional Facility ("Five Points") over a period of years,[4] which the Court now screens pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b).[5]

---

[3] Although Coleman has filed a number of additional exhibits since filing the second amended complaint, ECF Nos. 122-128, "[i]t is not the Court's responsibility to scour those exhibits and attempt to manufacture a cause of action from the information contained in those materials." *Belardo v. Annucci*, No. 9:22-CV-0032 (DNH/ATB), 2022 WL 22889131, at *3 (N.D.N.Y. May 10, 2022).

[4] The Court has done its best to account for all of the allegations, claims, and defendants arising in this District, but the expansive nature of the second amended complaint has made that a difficult task.

[5] Coleman has exceeded the scope of amendment permitted by the initial screening order, but because of his *pro se* status, the Court has exercised its discretion and screened all discernable claims that occurred in this District.

For the reasons that follow, the claims and defendants arising from Coleman's confinement at Clinton and Midstate are severed and transferred to the Northern District of New York. As set forth in detail below, some of Coleman's remaining claims may proceed to service, while other claims are either dismissed with prejudice or without prejudice.

## BACKGROUND

Coleman's familiarity with the initial screening order [ECF No. 112] is presumed. As noted in that order, 28 U.S.C. § 1915A requires the Court to review "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to dismiss that complaint if it "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." ECF No. 112 at 9.

In evaluating the complaint, the Court must accept all factual allegations as true and draw all inferences in the plaintiff's favor. *Id.* (citing *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003)). Accordingly, the recitation of facts throughout this Decision and Order presume the truth of Coleman's factual allegations for the purposes of this Order only; they are not factual findings of this Court.

The events addressed in the second amended complaint span conduct that occurred at facilities within and outside of this District. This Order addresses only those events that occurred at facilities in this District—*i.e.*, Lakeview, Attica, and Five Points.

### Lakeview: October 2021–2022

Coleman alleges that he was transferred to Lakeview in October 2021. ECF No. 118-11 at ¶ 186. Although it is unclear how long Coleman remained at Lakeview, during this period of incarceration, cell-side sick calls were conducted in violation of the Health Insurance Portability and Accountability Act ("HIPAA"). *Id.* at ¶ 187.

### Attica: August 10–September 21, 2022

Coleman was transferred from Auburn Correctional Facility ("Auburn") to Attica on August 10, 2022. *Id.* at ¶ 202. Upon his arrival at Attica, Coleman was served with a misbehavior report carried over from Auburn, causing him to be placed in Special Housing Unit ("SHU") confinement with a cell shield "that contained feces, urine, and dirt stains." *Id.* at ¶ 203. Coleman promptly complained to Tomporowski and requested a change of clothes and removal of the cell shield, as Coleman "did not receive a cell shield order." *Id.* at ¶¶ 138, 203.

Coleman received a sentence of 1,460 days of SHU confinement with a loss of commissary and packages following an August 12, 2022 hearing conducted by Stackowski, Auburn's Deputy Superintendent of Security. *Id.* at ¶¶ 102, 204. On August 16, 2022, Coleman was placed on a "restricted diet." *Id.* at ¶ 205. The following day, Coleman informed Tomporowski that restricted meals were unlawful, and he was taken off the restricted diet before lunch that same day. *Id.* at ¶ 206.

Based on false information provided by Tomporowski, the cell shield order was renewed, without being cleaned, on August 19 and 26, 2022. *Id.* at ¶ 207. Coleman contends that this occurred in retaliation for his alleged assault on staff. *Id.*

On August 26, 2022, Coleman received a response to his grievance complaining of "no bucket, no change of clothes, no pillow, and a renewed cell shield without being provided a copy of the original cell shield order." *Id.* at ¶ 208. Tomporowski lied in his response to the grievance that Coleman was given the missing items. *Id.* Several days later, Coleman was provided with a shirt, a pair of boxer shorts, and socks, but he never received a pillow, bucket for hot water, or uniform. *Id.* at ¶ 209.

On August 27, 2022, Coleman complained to Deputy Superintendent Middlebrook ("Middlebrook"), the Law Library Administrator, that a law library officer refused to give him a library request form. *Id* at ¶¶ 210, 144. Coleman believed this refusal was an act of retaliation. *Id.* He filled out additional request forms on September 5 and September 8, 2022, but the requested materials were not provided until September 11, 2022. *Id.* at ¶ 210. His repeated requests for a notary went unanswered. *Id.*

On August 30, 2022, Coleman wrote a letter to Wolcott and requested that she preserve certain video and audio evidence in relation to his litigation. *Id.* at ¶ 211. On September 13, 2022, Coleman wrote to Wolcott to inform her that he had not been provided with his personal property or a comb and toothpaste. *Id.*

In total, Coleman alleges that he spent 42 consecutive days in SHU confinement at Attica before being transferred to Midstate Correctional Facility. *Id.* at ¶ 212. He was strip frisked before his transfer. *Id.*

**Five Points: August 21–September 11, 2023**

Following his incarceration at Midstate and Green Haven, Coleman arrived at Five Points on August 21, 2023 for a court appearance. *Id.* at ¶ 221. While at Five Points, Coleman was housed in the Residential Rehabilitation Unit ("RRU") and, for 20 consecutive days, was "not afforded seven hours [of] out-of-cell activities." *Id.* at ¶¶ 221-22. Coleman was strip frisked prior to being transferred to Green Haven on September 11, 2023. *Id.* at ¶ 223.

### Lakeview: December 2023–February 2024

Coleman was transferred to Lakeview on December 15, 2023. *Id.* at ¶ 225. There, he was not afforded "seven hours [of] out-of-cell activities daily," "an unrestricted commissary purchase of $90," or "unrestricted packages consisting of food, bedding, and clothing for the entirety of [Coleman's] stay at Lakeview," which ended on February 26, 2024. *Id.* at ¶ 226. On the day of his transfer to Wende, Coleman was "sexually assaulted" by Correction Officer Chad Frederickson ("Frederickson"), who "groped" his genitals during a "wellness check" in his cell. *Id.* at ¶¶ 141, 227. Coleman was then strip frisked when he arrived at Wende. *Id.* at ¶ 227.

### Attica: March 2024–April 2025

Coleman returned to Attica on March 4, 2024. *Id.* at ¶ 228. On March 18, 2024, he was found guilty of charges arising at Lakeview "without being afforded counsel." *Id.* at ¶ 230. Following the completion of his disciplinary hearing, Tomporowski threatened Coleman for the grievances he had filed in 2022. *Id.* At some point

thereafter, Tomporowski issued a false and retaliatory misbehavior report. *Id.* at ¶ 234.

On April 1, 2024, Coleman was found guilty of the charges in that misbehavior report at a hearing presided over by Supervising Offender Rehabilitation Coordinator Littlejohn ("Littlejohn"). *Id.* at ¶¶ 129, 234. Littlejohn "sanctioned [Coleman] to loss of commissary, loss of packages, and loss of static tablet in a total disregard for" the Humane Alternative Long Term Solitary Confinement Act ("HALT Act"), N.Y. Correct. Law § 137, which prohibits "limitations on food, clothing, bedding, and services as a form of punishment." *Id.* at ¶ 235.

After Coleman told Littlejohn that the video of the March 18, 2024 incident underlying the misbehavior report was edited, Littlejohn wrote a different hearing tape number on the disposition. *Id.* Coleman believes that this was done "to cover-up" that an altered video was used at the hearing. *Id.*

On March 20, 2024, Coleman was moved from the SHU to the RRU. *Id.* at ¶ 231.[6] Coleman "was not provided seven hours [of] out-of-cell activities, a storage container, initial clothing, two . . . net bags, or cleaning supplies." *Id.* He was housed in "a filthy cell with dirty ventilation, a cell shield restricting his breathing, and a molded cieling [sic]." *Id.* The cell did not have hot water or an electrical outlet. *Id.*

---

[6] The HALT Act created RRUs. *See DeJesus v. Palmer*, No. 22-CV-716 (JLS), 2024 WL 2818879, at *2 n.3 (W.D.N.Y. May 31, 2024). These units are intended "for inmates who cannot enter segregated confinement and are defined as 'therapeutic and trauma-informed, and aim to address individual treatment and rehabilitation needs and underlying causes of problematic behaviors.'" *Id.* (quoting N.Y. Correct. Law § 2(34)). "Pursuant to the HALT Act, individuals in segregated confinement receive four hours of out of cell programming, including one hour of recreation, and individuals in RRUs receive at least six hours of out of cell programming with an additional hour of recreation." *Id.* (citing at N.Y. Correct. Law § 137(6)(j)(ii)).

Coleman wrote letters and filed grievances complaining of his conditions of confinement. *Id.* at ¶¶ 233, 252. Coleman learned that Martuscello has the "Attica RRU on . . . electronic deprivation to punish 'Assholes' as he discriminates against [inmates] with disciplinary histories." *Id.* at ¶ 252.

At one point, Coleman alleges that the retaliatory cell shield remained on the cell until April 27, 2024, *id.* at ¶ 242, elsewhere he states that it was not removed until January or February of 2025. *Id.* at ¶ 264. On December 31, 2024, "Raczcowski biasly [sic] responded to . . . Coleman's cell shield complaints which caused C.O. McCarthy to not feed Plaintiff." *Id.* at ¶ 263.

For a court appearance on March 26, 2024, and after his return from medical on April 8 and August 15, Coleman was strip searched despite his requests to be body scanned instead. *Id.* at ¶¶ 232, 238, 254. The April 8, 2024 strip frisk was recorded. *Id.* ¶ 238. Coleman alleges that the strip frisks violate his "religious beliefs as a[n] Isr[ae]lite who follows the Torah[.]" *Id.* at ¶ 276.

Another strip frisk was conducted on November 22, 2024 by Correction Officer Cornmiller ("Cornmiller") upon Coleman's return from a visit. *Id.* at ¶ 259. During this strip frisk, Cornmiller stared at his genitals while Correction Officer Fitshans ("Fitshans") and John Doe #3 "laughed hysterically." *Id.* Coleman was forced to remain naked and cold for over 30 minutes, which they found "amusing." *Id.*

Coleman "later was extracted"[7] at Middlebrook's direction and "forced to spread his buttocks" as Fitshans, Cornmiller, and John Doe # 3 "continuously laughed as [he] was degraded[.]" *Id.* This strip frisk was recorded by security cameras and "later used to further degrade and humiliate . . . Coleman at a Tier 3 Superintendent's Hearing." *Id.* Following this strip frisk, Coleman was placed in the contraband watch room for four to five days. *Id.* at ¶ 260.

This strip frisk incident resulted in a misbehavior report, and Coleman was found guilty of the charges in the misbehavior report "without being provided a free attorney[.]" *Id.* at ¶ 261. After this determination was affirmed, Coleman appealed it to the Albany Supreme Court, where it remains pending. *Id.*

On April 7, 2024, Coleman was "drugged, sexually violated." *Id.* at ¶ 237. Thereafter, Fitshans "forcefully slammed [Coleman] onto a stretcher and brought him to medical." *Id.*[8]

Coleman's cell was searched on April 27, 2024 by unidentified employees who "tampered" with his legal papers and "removed a letter [he] wrote to . . . Martuscello regarding sexual violations/body scan alternative to strip frisks." *Id.* at ¶ 242. When Coleman returned to his cell from a medical visit on August 15, 2024, his logbook, which documented instances of cruel and unusual punishment, was "gone." *Id.* at

---

[7] Coleman does not allege that this occurred on a different day. The Court is therefore treating these as back-to-back strip frisks that occurred on November 22, 2024.

[8] The individuals who drugged and sexually violated Coleman are not identified. Fitshans's involvement appears to be limited to the use of force.

¶ 254. "[M]ultiple documents" were also missing following an August 21, 2024 cell search. *Id.* at ¶ 256.

On May 8, 2024, a "cell-side sick call" was conducted by an unidentified individual in violation of Coleman's HIPAA rights. *Id.* at ¶ 245. Although Coleman was not subject to a restraint order, he was forced to wear restraints. *Id.* at ¶ 246 n.17. Correction Officer Ford "lied" when he reported on May 18, 2024 that Coleman "refused to return his feed-up tray and made throwing motions." *Id.* at ¶ 247.

On April 18, April 22, May 6, and May 21, 2024, unidentified correction officers "purposefully flooded the toilets . . . causing urine and feces to cover [Coleman.]" *Id.* at ¶¶ 239, 240, 244, 248. This flooding also caused some of Coleman's legal papers to be destroyed. *Id.* at ¶¶ 244, 248. No cleaning supplies were provided and Coleman was not moved. *Id.* at ¶¶ 240, 244. Despite Wolcott witnessing the flood of human waste during her weekly walk-throughs, and Coleman and other inmates begging her to be moved, nothing was done. *Id.* at ¶ 248. On May 22, 2024, the B-North Gallery was given a "mop, broom, and rag to clean the feces and urine," but no "decontaminating supplies," which caused the smell to remain for "several weeks." *Id.* at ¶ 249.

From May 21 to June 3, 2024, Coleman was on a hunger strike during which he refused 40 consecutive meals, but "DOCCS employees" refused to record this in order "to prevent a documented hunger strike." *Id.* at ¶ 250. Specifically, he identifies John Doe # 3 as having served him over ten meals that were refused but not documented. *Id.* at ¶ 251. Coleman made Wolcott aware that he was on a hunger

strike that was not documented, but she disregarded this information and failed, along with Governor Kathy Hochul ("Governor"), Attorney General Letitia James ("Attorney General"), Martuscello, and Anthony Rodriguez ("Rodriguez"), in their duty to "notify OMH [Office of Mental Health] of a suicide attempt[.]" *Id.* at ¶ 250 n.19.

On August 14, 2024, Coleman was told to take two Suboxins by Registered Nurse L. *Id.* at ¶ 253. He was later escorted to medical because he was given incorrect medicine. *Id.*

Correction Officer Ebert ("Ebert"), who made "vulgarities about Jews[,]" purposefully did not give Coleman his Passover meal, *id.* at ¶ 241, and ate Coleman's Sukkot Holiday meal in 2024, *id.* at ¶ 258. That year Coleman also did not receive his Rosh Hashanah meal. *Id.* at ¶ 258. On November 17, 2024, Ebert, "accidentally gave [Coleman] the wrong meal and then refused to give [him] the correct meal[.]" *Id.* at ¶ 262.

On August 16, 2024, Martuscello and the Governor had John Doe #9 respond to his letter concerning "religious, sexual (strip frisk), and HIPPA violations." *Id.* at ¶ 255. The referenced response letter was sent by Jeff McKoy, Deputy Commissioner for Program Services, who informed Coleman that "[t]he facility was contacted regarding [his] concerns and staff has advised that [he was] presented with and accepted a religious meal menu that accommodates [his] known medical needs[.]" ECF No. 68 at 1. Coleman was also informed that his concerns concerning strip frisks

"were brought to the attention of the facility and the facility assured that all strip frisks are conducted in accordance with Directive #4910." *Id.*

The DOCCS's correction officer strike that began on February 28, 2025 caused Coleman to be confined to his Attica cell 24 hours a day, which continued until he was transferred to Midstate on April 16, 2025. ECF No. 118-11 at ¶¶ 192, 265 n.24.

Coleman alleges violations of the First, Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments. *Id.* at ¶ 66. Coleman requests money damages, as well as declaratory and injunctive relief. *Id.* at ¶ 79. He further seeks class action certification. *Id.*

## STANDARD OF REVIEW

A court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the court determines the action "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)–(2); *see* 28 U.S.C. § 1915(e)(2)(B) (setting forth the same criteria for dismissal). Generally, the Court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (quoting *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999)). Permission to amend, however, "is not required where the plaintiff has already been afforded the opportunity to amend." *Bivona v. McLean*, No. 9:19-

CV-0303(MAD)(TWD), 2019 WL 2250553, at *5 (N.D.N.Y. May 24, 2019) (citing cases); *Gomez*, 171 F.3d at 796 ("[A] *pro se* plaintiff who is proceeding *in forma pauperis* should be afforded the same opportunity as a *pro se* fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim."); *Cancel v. New York City Hum. Res. Admin./Dep't of Soc. Servs.*, 527 F. App'x 42, 44 (2d Cir. 2013) (summary order) ("[T]he district court had already permitted [the plaintiff] to amend his complaint once, and nothing in his amended complaint suggested that he would be able to state a valid . . . claim if he were granted leave to amend a second time. Therefore, granting [the plaintiff] leave to amend his amended complaint as to these claims would have been futile."); *Cato v. Zweller*, No. 6:21-CV-6207 EAW, 2023 WL 8653857, at *2 (W.D.N.Y. Dec. 14, 2023) (dismissing the amended complaint with prejudice because it "does not remedy any of the pleading deficiencies identified in the Screening Order").

## DISCUSSION

### I.    Claims Previously Permitted to Proceed to Service

The Court previously permitted the following claims to proceed to service: Coleman's Eighth Amendment claims against Tomporowski concerning the conditions of his SHU confinement from August through September 2022 and against Annucci arising from violations of the HALT Act in connection with his SHU confinement that began on August 10, 2022 at Attica. *See* ECF No. 112 at 18.

### II.    Severance and Transfer of Claims and Defendants

Under 28 U.S.C. § 1391(b), a civil action may be brought in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). For the "convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a).

Federal Rule of Civil Procedure 18(a) permits a plaintiff to join as many claims as the plaintiff may have against a particular defendant, but Fed. R. Civ. P. 20(a)(2) does not allow a plaintiff to pursue "unrelated claims against multiple defendants." *Reed v. City of N.Y.*, No. 1:20-CV-8352 (LLS), 2020 WL 7389095, at *4 (S.D.N.Y. Dec. 15, 2020). To remedy defects with the joinder of parties and claims, Fed. R. Civ. P. 21 provides that the court may, *sua sponte*, "sever any claim against a party."

In determining whether to sever a claim, courts consider the following:

(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Gentile v. Latona*, No. 21-CV-1100 (JLS), 2022 WL 19836964, at *3 (W.D.N.Y. Sept. 20, 2022) (quoting *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 580 (E.D.N.Y. 1999)).

"Where the 'administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants.'" *McTerrell v. Five Points C.F.*, No. 22-CV-331 (JLS), 2023 WL 7474975, at *7 (W.D.N.Y. July 28, 2023) (quoting *Cain v. New York State Bd. of Elections*, 630 F. Supp. 221, 225–26 (E.D.N.Y. 1986)). The "decision to sever lies 'within the discretion of the Court.'" *Id.* (quoting *Cain*, 630 F. Supp. at 225).

Coleman raises claims arising from his confinement at Clinton (ECF No. 118-11 at ¶¶ 147-85) and Midstate, (*id.* at ¶¶ 213-17), both located within the geographic confines of the Northern District of New York. Those claims are more appropriately heard in that District.  There is neither complete overlap in defendants nor claims with the claims and defendants arising from Coleman's confinement in this District. For instance, Coleman's claims arising from his confinement at Clinton concern COVID-19 measures and excessive force incidents. ECF No. 118-11 at ¶¶ 147-80. Likewise, Coleman's claims arising from his confinement at Midstate concern the conditions of being housed in a step down to population ("SDP") unit. *Id.* at ¶¶ 213-17. The Court is also mindful of the burden created by requiring individuals who are employed and most likely reside in the Northern District to travel to the Western District to defend allegations that occurred in the Northern District. *See Gentile*, 2022 WL 19836964, at *3.

Pursuant to Fed. R. Civ. P. 21 and 28 U.S.C. § 1404(a), the Court exercises its discretion to sever the claims arising from Coleman's confinement at Clinton and

Midstate. These claims and defendants are transferred to the Northern District of New York in the interests of justice and judicial efficiency. The Court makes no ruling as to the sufficiency of the claims arising from Coleman's confinement at Clinton or Midstate and leaves that determination to the Northern District of New York.

The severance and transfer to the Northern District of New York shall include Defendants E. Castine, J. Friend, K. Guynup, Wrag Laporte, C. Lawfler, Adam Lord, Justin Mahan, J. Mullady, Zachary Buckley, Michael Moran, J. Newphew, N. Johnston, Brian Poupore, D. Bombardier, Austin Newell, Jim Vann, Stacey Manor, Torrin Fitten,[9] C.O. Lamoy, Andrew Cymbrak, C. Gadway, Matthew Liberty, D. Mason, Terry Allen, Lt. Guynup, Earl Bell, David Duquette, Kevin Santo, Gregory King, Chad Rodier, C.H.O. Liberty, John Doe ##4, 7, Mark Passage, Brian Hilton. Additionally, the claims arising from Coleman's confinement at Clinton and Midstate identify Defendants Annucci, Martuscello, New York State Governor Kathy Hocul ("Governor"), Joseph Noeth, Anne Marie McGrath, and John Doe ##8–10, who are also Defendants to the claims remaining in this District. ECF No 118-11 at ¶ 146 n.3. The claims against these Defendants that relate to incidents that occurred at Clinton and Midstate are severed and transferred to the Northern District of New York. They otherwise remain Defendants to the claims remaining in this District.[10]

---

[9] This defendant is also spelled Torin Fittin.

[10] The Court recognizes that Coleman also asserts claims against John Doe #2 arising from his confinement at Green Haven—a facility located in the Southern District of New York. The skeletal allegations concerning Coleman's brief confinement at Green Haven, which encompass a single strip frisk upon his arrival and one day of being in restraints for some unspecified period and not provided seven hours of out-of-cell activities, fall well short of stating a plausible claim. ECF No. 118-11 at

III.    **Sovereign Immunity**

"Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it . . . a State cannot be sued directly in its own name regardless of the relief sought." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984). New York has not waived its Eleventh Amendment immunity to suit under § 1983, *see Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38–40 (2d Cir. 1977), and state sovereign immunity has not been abrogated by § 1983, *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–66 (1989); *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990).

The Eleventh Amendment bar extends to arms of the state and state officials sued in their official capacities for monetary damages. *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (arms of the state); *Graham*, 473 U.S. at 169 (official capacity).

Accordingly, Coleman's claims against the New York State Department of Corrections ("DOCCS"), the New York State Department of Mental Health, New York State Attorney General's Office, and New York State Governor's Office are dismissed

---

¶¶123, 218–220. Therefore, these claims are dismissed without prejudice. If and when these claims are realleged, the Court will address severance and transfer.

without prejudice.[11] Coleman's claims against the individual Defendants in their official capacity for monetary damages are also dismissed without prejudice.[12]

## IV.    First Amendment Claims

### A.    Retaliation

As set forth in the initial screening order, ECF No. 112 at 21-22, "[i]t is axiomatic that prison officials may not retaliate against prisoners for exercising their constitutional rights." *Grant v. Shields*, 1:19-CV-1188 EAW, 2022 WL3587754, at *3 (W.D.N.Y. Aug. 22, 2022). To allege a § 1983 retaliation claim, a prisoner must show: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009).

Only "retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights'" constitutes an "adverse action." *Lashley v. Wakefield*, 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) (alteration omitted) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004)). "This objective

---

[11] To the extent Eleventh Amendment dismissals have been found to be jurisdictional, the dismissal is without prejudice. *See Karupaiyan v. New York*, No. 23-1257, 2024 WL 2174272, at *2 (2d Cir. May 15, 2024) (summary order) ("[B]ecause the district court lacked jurisdiction over the claims against the State of New York, it was erroneous to dismiss those claims with prejudice rather than without prejudice.").

[12] Where, as here, "a *pro se* litigant does not specify in what capacity the individual defendants are being sued, courts generally 'liberally construe the complaint as alleging both official and individual capacity claims.'" *Anderson v. Pedalty*, No. 14-CV-00192, 2015 WL 1735192, at *3 (W.D.N.Y. Apr. 16, 2015) (quoting *McCloud v. Kane*, 491 F. Supp. 2d 312, 316 (E.D.N.Y. 2007)).

test applies even if the plaintiff was not himself subjectively deterred from exercising his rights." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 280 (N.D.N.Y. 2018). Moreover, courts recognize that retaliation claims by prisoners are "prone to abuse" since prisoners could potentially "claim retaliation based on any decision they dislike." *Vazquez v. City of New York*, No. 1:21-CV-01573 (PAE)(VF), 2022 WL 2704763, at *13 (S.D.N.Y. June 17, 2022) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)), *report and recommendation adopted*, 2022 WL 2704469 (S.D.N.Y. July 11, 2022). "Accordingly, even though '[p]risoners . . . have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right,' courts must examine a prisoner's retaliation claim with 'skepticism and particular care.'" *Speaks v. Saeed*, No. 14-CV-06826 (JMA)(AYS), 2022 WL 541767, at *7 (E.D.N.Y. Feb. 23, 2022) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

Coleman alleges a series of acts of alleged retaliation. First, on August 27, 2022, he complained to Middlebrook, the law library administrator, that a law library officer refused to give him a library request form. ECF No. 118-11 at ¶¶ 210, 144. Coleman alleges that this was an act of retaliation, *id.*, but even assuming that the refusal to provide him with a library request form constituted an adverse action, Coleman has not tethered it to any preceding protected activity. His complaint to Middlebrook arose *after* the alleged adverse action which undermines the existence of any causal connection. *See Ramrattan v. Guzman*, No. 9:22-CV-025(GTS)(ATB), 2023 WL 9552891, at *4 (N.D.N.Y. Aug. 17, 2023) ("[W]here a plaintiff alleges that

an adverse action occurred before the alleged protected activity, plaintiff cannot establish a causal connection between the two and dismissal is warranted."), *report and recommendation adopted*, 2024 WL 165077 (N.D.N.Y. Jan. 16, 2024).

Coleman also alleges that the cell shield renewal orders were in retaliation for his alleged assault on staff. ECF No. 118-11 at ¶ 207. However, "[a]n inmate's assault on an officer plainly does not constitute protected activity." *Jackson v. Dzurenda*, No. 3:11-CV-1668 RNC, 2012 WL 5448330, at *2 (D. Conn. Nov. 7, 2012).

Coleman further alleges that on December 31, 2024, "Raczcowski biasly [sic] responded to . . . Coleman's cell shield complaints which caused C.O. McCarthy to not feed [him]." ECF No. 118-11 at ¶ 263. Coleman does not supply any facts that plausibly allege there was a causal connection between his cell shield complaints and C.O. McCarthy's failure to feed him. For instance, there are no allegations that C.O. McCarthy knew of Coleman's cell shield complaints, or of the temporal proximity between the complaints and the adverse action. *See Herbert v. Raczkowski*, 24-CV-0485 (JLS), 2024 WL 3694215, at *8 (W.D.N.Y. Aug. 5, 2024) ("Without any non-conclusory allegations that the grievances and the wrongful conduct alleged are causally connected, his retaliation claims are little more than 'unadorned, the-defendant-unlawfully-harmed-me accusation[s].'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Lastly, Coleman alleges that following the conclusion of his March 18, 2024 disciplinary hearing, Tomporowski threatened him for the grievances he had filed in 2022. ECF No. 118-11 at ¶ 230. At some point shortly thereafter, Tomporowski

allegedly issued a false and retaliatory misbehavior report that resulted in punishment that contravened the HALT Act. *Id.* at ¶¶ 234-235. This sufficiently alleges an adverse action. *See Barnes v. Uhler*, No. 9:19-CV-109 (ECC/MJK), 2025 WL 2933583, at *24 (N.D.N.Y. Feb. 21, 2025) ("[T]he filing of a false misbehavior report that results in some form of punishment that cannot be labeled as *de minimis* has been found sufficient to constitute adverse action.") (collecting cases), *report and recommendation adopted*, 2025 WL 2751595 (N.D.N.Y. 2025). Thus, Coleman's allegations are sufficient to state a colorable claim of retaliation that may proceed against Tomporowski.

As for the other retaliation claims, Coleman was advised in the initial screening order of the elements necessary to state a retaliation claim, and had an opportunity to replead his retaliation claims to correct the deficiencies. He did not do so and still gives no indication that he can state a valid claim. The remaining retaliation claims are therefore dismissed with prejudice. *See Abascal v. Hilton*, No. 9:04-CV-1401(LEK/GHL), 2008 WL 268366, at *8 (N.D.N.Y. Jan. 30, 2008) ("Of course, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading."), *aff'd sub nom. Abascal v. Jarkos*, 357 F. App'x 388 (2d Cir. 2009) (summary order); *Santos v. Jones*, No. 22-CV-6338-EAW, 2023 WL 3496707, at *8 (W.D.N.Y. May 17, 2023) ("Because the Court previously apprised Plaintiff of the elements required to allege a failure to intervene or failure to protect claim . . . , dismissal is with prejudice."); *Alexander v.*

*Doe [1]*, No. 23-CV-6168-FPG, 2023 WL 7301393, at *5 (W.D.N.Y. Nov. 6, 2023) (same).

### B.    Access to Courts

On September 5 and September 8, 2022, Coleman requested materials from the law library, but the materials were delayed several days. ECF No. 118-11 at ¶ 210. Coleman's repeated requests for a notary also went unanswered, *id.,* and he had numerous documents taken from his cell, *id.* at ¶¶ 242, 254, 256.[13]

As discussed in the initial screening order, to state a claim for denial of access to the courts, a plaintiff must allege facts showing that the defendant's conduct "was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 692 (S.D.N.Y. 2016) (citation omitted). To demonstrate actual injury, a plaintiff must allege that "the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim." *Zeigler v. New York*, 948 F. Supp. 2d 271, 294 (N.D.N.Y. 2013) (citation omitted). "Mere 'delay in being able to work on one's legal action or communicate with

---

[13] At points, Coleman alleges that he requested that certain videos be preserved. *See, e.g.,* ECF No. 118-11 at ¶ 211. While there are no express allegations that Wolcott failed to abide by Coleman's requests, even if the video was not preserved, these allegations would fail to state a claim. "In a [§] 1983 claim alleging a cover-up by government agents, the constitutional right at issue is the First Amendment right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Taranto v. Putnam County*, No. 21-CV-2455 (KMK), 2023 WL 6318280, at *13 (S.D.N.Y. Sept. 28, 2023) (quoting *Tavares v. N.Y.C. Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015)). In short, "such claims are available only if a judicial remedy was 'completely foreclosed' by the . . . nondisclosure." *Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) (citation omitted). But the second amended complaint fails to plausibly allege an actual injury from any impediments to Coleman's access to the surveillance video.

the courts does not rise to the level of a constitutional violation.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citation omitted).

Coleman fails to point to any prejudice arising from the delay in receiving law library materials, the theft of papers from his cell, or from the absence of notary services. The initial screening order alerted Coleman to this deficiency, and it has not been remedied. ECF No. 112 at 23-24. Coleman's access to courts claim arising from these alleged deprivations is therefore dismissed with prejudice.

### C.    Free Exercise

Coleman alleges that Ebert purposefully did not give him his Passover meal, ECF No. 118-11 at ¶ 241, and ate Coleman's Sukkot Holiday meal in 2024, *id.* at ¶ 258. That year Coleman also did not receive his Rosh Hashanah meal. *Id.* He also alleges that the strip frisks violate his "religious beliefs as a[n] Isrealite who follows the Torah[.]" *Id.* at ¶ 276.

"It is well-established that the First Amendment affords inmates constitutional protection to practice their religion." *Barry v. Russo*, No. 22-CV-3835 (KMK), 2024 WL 965000, at *7 (S.D.N.Y. Mar. 5, 2024) (citing, *inter alia*, *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987)). This includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975).

To state a First Amendment free exercise claim, a prison inmate must allege that (1) "the practice asserted is religious in the person's scheme of beliefs" and "the belief is sincerely held"; (2) "the challenged practice of the prison officials infringes

upon the religious belief"; and (3) "the challenged practice" does not further "legitimate penological objectives." *Id.* at 128 (alteration omitted) (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

At this stage, Coleman's claim that Ebert purposefully withheld at least two religious meals is sufficient to state a free exercise of religion claim that may proceed to service. *See Shakur v. Selsky*, 391 F.3d 106, 120 (2d Cir. 2004) (allegation that the defendants refused to allow the plaintiff to attend a "religious feast" sufficed to plausibly allege a free exercise claim).

Coleman, however, has not stated a free exercise claim arising from the strip searches. "Generally, strip searches have been upheld as a reasonable security measure within a correctional facility even in the absence of probable cause as long as they are related to a legitimate penological goal." *Diallo v. New York City*, No. 23-CV-1238 (LAP), 2025 WL 522514, at *12 (S.D.N.Y. Feb. 18, 2025) (citation omitted). Consequently, courts "consistently rejected claims that standard strip searches violate the First Amendment rights of Muslim inmates whose religion might forbid them from being seen naked by other individuals." *Id.* (citation omitted). Based on the limited facts supplied by Coleman, the Court sees no reason why the same result should not apply here. Because this claim was not previously asserted in the amended complaint, Coleman's free exercise claim arising from strip searches is dismissed without prejudice.[14]

---

[14] Coleman alleges that Martuscello and the Governor had John Doe #9 respond to his letters concerning "religious, sexual (strip frisk), and HIPPA violations." ECF No. 118-11 at ¶ 255. However, that does not establish the personal involvement of Martuscello or the Governor. *See McCrary v. Marks*, 836 F. App'x 73, 74 (2d Cir. 2021) (summary order) ("[T]he most [the plaintiff] has alleged is

## V.    Fourth Amendment

### A.    <u>Strip Frisks</u>

As set forth in the initial screening order, ECF No. 112 at 25-26, "inmates retain a limited right to bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "To state a cognizable privacy claim, an inmate must allege that (1) he 'exhibited an actual, subjective expectation of bodily privacy,' and (2) prison officials lacked sufficient justification to intrude on the inmate's Fourth Amendment rights." *Telesford v. Annucci*, 693 F. App'x 1, 3 (2d Cir. 2017) (summary order) (citation modified).

Coleman alleges that his strip frisks at the Attica RRU were conducted in view of video cameras. *See, e.g.*, ECF No. 118-11 at ¶ 238. But "the presence of cameras" does not make "an otherwise constitutional strip search unconstitutional." *Smith v. City of New York*, No. 14 CIV. 5934 JCF, 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015); *see also Peek v. City of New York*, No. 13-CV-4488 AJN, 2014 WL 4160229, at *3 (S.D.N.Y. Aug. 18, 2014) ("The Court has not located any authority from within or outside the Second Circuit suggesting that simply capturing a strip search on camera renders the search unconstitutional. To the contrary, courts appear to have consistently rejected [such] claims[.]").

Coleman has not alleged anything suggesting that there was not a legitimate purpose to this policy or that it was unjustified, except for his conclusory allegation

---

that [the supervisor] received his letter and directed someone at the TVPA to respond to it. That is clearly not enough to state a claim against [the supervisor].").

that the video of the November 22, 2024 strip frisk "was used to degrade and humiliate [him] at a Tier 3 Superintendent's Hearing." ECF No. 118-11 at ¶ 259. Coupled with the conclusory allegation, the related Misbehavior Report indicates that Coleman was disciplined for urinating on the floor and making threats during the strip search. ECF No. 93 at 11. Under these circumstances, there is nothing to suggest that the use of the video of the incident at the disciplinary hearing did not serve a legitimate purpose.

Because Coleman has already had an opportunity to replead his Fourth Amendment privacy claim and still gives no indication that he can state a valid claim, this claim is dismissed with prejudice.

## VI.    Eighth Amendment

### A.    <u>Cell Conditions</u>

"Under the Eighth Amendment, officials may not 'create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety.'" *Barnes v. County of Monroe*, 85 F. Supp. 3d 696, 737 (W.D.N.Y. 2015) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003)). However, "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citation omitted). To allege a plausible Eighth Amendment claim based on conditions of confinement, an inmate must plead that "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively,

the defendant official acted with a sufficiently culpable state of mind such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation modified).

"To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* "There is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (citation modified).

"To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" *Walker*, 717 F.3d at 125 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "The prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57 (citing *Farmer*, 511 U.S. at 837).

### i. *Waste Discharges at Attica: April and May of 2024*

Coleman alleges that unidentified correction officers purposefully flooded an area with urine and feces in April and May of 2024, and refused to provide any supplies to clean the waste. ECF No. 18-11 at ¶¶ 239, 240, 244, 248. These allegations plainly satisfy the objective component. He also alleges that Wolcott personally witnessed this during her weekly walk through and heard requests from Coleman and other inmates to be moved. *Id.* at ¶ 248. These facts are sufficient at this stage

to allege a colorable conditions of confinement claim against Wolcott that may proceed to service.

### ii.    RRU Confinement at Five Points and Attica

Coleman alleges that while in the Five Points RRU from August 21, 2023 to September 11, 2023 and the Attica RRU from March 20, 2024 to April 16, 2025, he was denied "seven-hours [of] out-of-cell activities." ECF No. 118-11 at ¶¶ 279-80.

Coleman appears to base this Eighth Amendment conditions of confinement claim on a violation of the HALT Act, which requires that "individuals in RRUs receive at least six hours of out of cell programming with an additional hour of recreation." *DeJesus*, 2024 WL 2818879, at \*2 n.3 (citing N.Y. Correct. Law § 137(6)(j)(ii)). He also points to the use of restraints for out-of-cell activities in violation of the HALT Act. ECF No. 118-11 at ¶ 78 (citing N.Y. Correct. Law § 137(6)(j)(vii)).

Coleman further alleges that while in the RRU he was denied "food, bedding, clothing, and services (commissary and packages) as a form of punishment in violation of the HALT Act." ECF No. 118-11 at ¶¶ 282-83 (citing N.Y. Correct. Law § 137(6)(j)(iii) (prohibiting any "limitation on services, treatment, or basic needs such as clothing, food and bedding shall be imposed as a form of punishment."")).[15]

---

[15] The Northern District previously dismissed Coleman's state law claims arising from the HALT Act, explaining that "[a] Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations or state law." *Coleman v. Annucci, et al.*, 9:23-cv-00401-GTS-TWD (N.D.N.Y.), ECF No. 45 at 7 (citations omitted). The Court interprets the second amended complaint as raising constitutional violations based on the failure to comply with the HALT Act. *See, e.g.*, ECF No. 118-11 at ¶ 78.

At the screening stage, these deprivations state a colorable Eighth Amendment claim that may proceed to service against Annucci, Martuscello, Wolcott, Noeth, and the John Doe Supervisor of Five Points. *See Santana v. Quiros*, No. 3:21-CV-376 (SVN), 2022 WL 16706959, at *9 (D. Conn. Nov. 4, 2022) (the "Second Circuit has explained, dismissal is 'especially disfavored' when 'the complaint sets forth a novel legal theory that can best be assessed after' further factual and legal development" (quoting *Baker v. Cuomo*, 58 F.3d 814, 818–19 (2d Cir. 1995), *vacated in part on other grounds sub nom. Baker v. Pataki*, 85 F.3d 919 (2d Cir. 1996) (en banc))).

### iii. *Cell Shield, Electricity, and Mold*

Coleman's claim against Tomporowski, Ford, Wolcott, and Cornmiller for deliberately utilizing a cell shield "to punativly impead [sic]" his "breathing," ECF No 118-11 at ¶ 290, in a cell with a moldy ceiling, *id.* at ¶ 231, as well as his claim against Martuscello for implementing a deprivation order in the RRU that prevented the use of electricity in the cells, *id.* at ¶ 291, state colorable Eighth Amendment conditions of confinement claims. S*ee Hicks v. Lannoye*, No. 20-CV-505, 2021 WL 2454050, at *1 (E.D. Wis. June 16, 2021) (although later dismissed at summary judgment, plaintiff "was allowed to proceed on an Eighth Amendment conditions of confinement claim for having no electricity in his cell for several days").

### iv. *Inadequate Nutrition*

Coleman makes a variety of allegations concerning being placed on a "restricted diet." ECF No. 118-11 at ¶ 205, not receiving the correct meal, *id.* at ¶ 262, not being fed by C.O. McCarthy, *id.* at ¶ 263, and having limited access to food while

in the RRU, *id.* at ¶ 282.

As set forth in the initial screening order, ECF No. 112 at 16-17, "the Constitution requires that prisoners be fed nutritionally adequate food and 'under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.'" *Sankara v. Montgomery*, 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018). "To establish a valid claim that the denial of food constitutes an Eighth Amendment violation, one must establish that there was a sufficiently serious condition that resulted from the food not being received." *Lewis v. Zon*, 920 F. Supp. 2d 379, 387 (W.D.N.Y. 2013) (citation modified).

Coleman fails to plausibly allege that he suffered a sufficiently serious condition—*i.e.*, "a condition of urgency that may result in degeneration or extreme pain." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1988)). Because Coleman was previously alerted to these deficiencies, had an opportunity to amend, and gives no indication that he can state a claim, the dismissal of these claims is with prejudice.

### v.    Cell Confinement During the Strike

Coleman alleges that Ford, John Doe #3, Ebert, Fitshans, and Cornmiller caused him to be confined in his cell for 24 hours a day from the beginning of the DOCCS's correction officer strike on February 28, 2025, until his transfer from Attica to Midstate on April 16, 2025. ECF No. 118-11 at ¶ 265 n.24. Coleman alleges that

he has remained on 24-hour lockdown since his transfer to Midstate, well beyond the strike. *Id.* at ¶ 265.

"Courts have recognized that some opportunity for exercise must be afforded to prisoners." *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985). Prison officials may, however, "limit an inmate's right to out-of-cell exercise if 'a valid safety exception or certain unusual circumstances' exist." *Santana v. Quiros*, No. 3:21-CV-376(KAD), 2021 WL 2138772, at *4 (D. Conn. May 26, 2021) (quoting *Gardner v. Murphy*, 613 F. App'x 40, 42 (2d Cir. 2015) (summary order)). "When prison officials impose such a safety restriction, they 'must perform a detailed review' of feasible alternatives." *Id.* (citation modified) (quoting *Gardner*, 613 F. App'x at 42).

Coleman's restrictive confinement for more than a month, without any access to recreation or other out-of-cell activities, is sufficient at this stage to state a colorable Eighth Amendment claim that may proceed to service against Ford, John Doe #3, Ebert, Fitshans, and Cornmiller. Whether there were legitimate penological purposes for this restrictive confinement, which is alleged to have continued well beyond the strike, is a question that the Court is unable to resolve at this stage.

### vi.    *Restraints*

Coleman alleges that Annucci enacted a blanket policy on April 21, 2022 requiring all inmates "housed in [SDP]" to be in restraints for all out-of-cell programs. ECF No. 118-11 at ¶¶ 200, 310. The second amended complaint does not, however, allege that Coleman was in a "step down population" unit or program while confined during the relevant periods in this District. *See id.* at ¶¶ 136-37, 215-16 (Coleman

appears to have been in SDP while at Midstate). His remaining claims concerning the use of restraints appear to have arisen outside of this District while he was incarcerated at Midstate and Green Haven. *Id.* at ¶¶ 216, 220, 289. Coleman's Eighth Amendment claims arising from the use of restraints, which are raised for the first time in the second amended complaint, are therefore dismissed without prejudice.

### B.    Excessive Force

On April 7, 2024, Fitshans "forcefully slammed [Coleman] into a stretcher" after he was "drugged" and "sexually violated." ECF No. 118-11 at ¶ 237. Fitshans then "brought [Coleman] to medical." *Id.*

To state a claim for the use of excessive force in violation of the Eighth Amendment, a plaintiff "must allege two elements, one subjective and one objective." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015).

As to the objective element, a plaintiff "must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8, 20 (1992)). Courts analyze this element according to the nature of the force used, rather than the degree of injury. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."). Consequently, a "malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* whether or not significant injury is evident." *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation modified).

To satisfy the subjective element, a plaintiff must allege that the defendant acted with a culpable state of mind, the "core . . . inquiry" being "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. Not "every malevolent touch," however, "gives rise to a federal cause of action." *Id.* at 9. The Eighth Amendment's prohibition against excessive force does not extend to "*de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id.* at 9–10 (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

Without additional details surrounding the incident, Coleman has not plausibly alleged either the objective or subjective elements necessary to state an Eighth Amendment claim. Because this is first time that he has alleged this claim, it is dismissed without prejudice.

### C.    Sexual Assault

While incarcerated at Wende, Coleman alleges that he was "sexually assaulted" by Frederickson, who "groped" his genitals during a wellness check in his cell. ECF No. 118-11 at ¶ 227.

"Allegations of sexual abuse or harassment can amount to a violation of a prisoner's right to be free from cruel and unusual punishment." *Herbert v. Raczkowski*, No. 24-CV-0485 (JLS), 2024 WL 3694215, at *9 (W.D.N.Y. Aug. 5, 2024). Indeed, "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the

Eighth Amendment." *Crawford*, 796 F.3d at 257. The key inquiry "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58. "[A] single act of sexual abuse may violate the Eighth Amendment if . . . it is entirely gratuitous and devoid of penological purpose." *Id.* at 256.

Whether Frederickson's contact with Coleman's genitals was a routine or otherwise legitimate part of the wellness check is a question the Court cannot resolve at this stage. Coleman's Eighth Amendment sexual assault claim against Frederickson may proceed to service.

Coleman also alleges that on April 7, 2024, he was "drugged, sexually violated". ECF No. 118-11 at ¶ 237. Lacking, however, are any allegations of which defendants, if any, had personal involvement in this conduct. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (holding that allegations showing the personal involvement of each defendant to the alleged deprivation is a pleading requirement). This claim, which was raised for the first time in the second amended complaint, is therefore dismissed without prejudice.

### D.    <u>Deliberate Indifference to Medical Care</u>

Coleman alleges that from May 21 to June 3, 2024, he was on a hunger strike during which he refused 40 consecutive meals, but "DOCCS employees" did not document this in order "to prevent a documented hunger strike." ECF No. 118-11 at ¶ 250. Due to the failure to document his hunger strike, Coleman alleges that OMH

was not notified of his attempted suicide, which was permitted to continue unabated. *Id.*

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Collymore v. Myers,* 74 F.4th 22, 30 (2d Cir. 2023) (alteration in original) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05. "The standard of deliberate indifference includes both subjective and objective components." *Chance,* 143 F.3d at 702.

The objective component requires a plaintiff to "show that, while he was incarcerated, he suffered from a medical condition that is, 'in objective terms, sufficiently serious.'" *Mallet v. N.Y. State Dep't of Corr. & Cmty. Supervision,* 126 F.4th 125, 132 (2d Cir. 2025) (quoting *Chance,* 143 F.3d at 702). "Though there is no single metric" for establishing a "sufficiently serious" medical condition, it "refers to a condition of urgency that may result in degeneration or extreme pain, that significantly affects daily activities, or that involves chronic and substantial pain." *Id.* (citation modified). On a spectrum, "[t]he condition need not be 'life-threatening' or 'at the limit of human ability to bear,' but it must be more than simply 'uncomfortable and annoying.'" *Id.* (quoting *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir. 2003)).

The subjective component requires that a defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (quoting *Farmer*, 511 U.S. at 837). A defendant's "'failure to alleviate a significant risk that he should have perceived but did not' does not meet this standard." *Id.* (quoting *Farmer*, 511 U.S. at 838).

The substantial risk of harm from skipping 40 consecutive meals is manifest and satisfies the objective element. As for the subjective element, Coleman alleges that both John Doe #3 and Wolcott were directly aware that Coleman was on a hunger strike but did not document or stop it. ECF No. 118-11 at ¶¶ 250-51. Wolcott is also alleged to have had a duty to notify OMH,[16] an entity that presumably could provide mental health services and attempt to cease the self-harm, but failed to do so. *See Bradshaw v. Gordon*, No. 9:21-CV-0645 (GTS/ML), 2022 WL 504974, at *10 (N.D.N.Y. Feb. 18, 2022) ("[T]he DOCCS Directive on Inmate Hunger Strikes indicates that an inmate who voluntarily refuses to eat nine consecutive meals is deemed to be 'on a hunger strike.' The Directive further indicates that an inmate on a hunger strike is 'referred to Health Services and to the [OMH] staff for counseling and clinical

---

[16] Coleman alleges that the Governor, Attorney General, Martuscello, and others received letters from him that he was on a hunger strike. ECF No. 118-11 at ¶ 250 n.18 (citing letters sent to the Attorney General and Rodriguez, ECF Nos. 53 and 57, advising them that he was on a hunger strike in protest). Receipt of a letter, however, is insufficient to establish personal involvement. *See Lopez v. Chappius*, No. 6:17-CV-06305 EAW, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) ("Even before *Tangreti*, it was 'well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged' . . . ." (citation omitted)).

assessment to determine the cause of the inmate's refusal to eat." (citation modified)). At this stage, these allegations are sufficient to state a colorable deliberate indifference claim against John Doe #3 and Wolcott that may proceed to service.

Coleman also alleges that on August 14, 2024, he was erroneously told to take two Suboxins by Registered Nurse L. ECF No. 118-11 at ¶ 253. But Coleman has not alleged that the medication error was attributable to anything other than negligence or placed Coleman in a serious risk of harm. To the extent that Coleman has not previously raised these claims, they are dismissed without prejudice.

### E.   Strip Frisks

As set forth in the initial screening order, under certain limited circumstances, the manner in which a search is conducted may give rise to an Eighth Amendment claim. *See Crawford*, 796 F.3d at 258. The "principal inquiry" a court must make "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58. "[P]rison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches," but such searches "may not be undertaken maliciously or for the purposes of sexually abusing an inmate." *Id.* at 258. Strip frisks are unconstitutional where they do "not serve a legitimate penological goal, such as . . . to intimidate, harass, or punish a prisoner." *Jones v. City of New York*, 18-CV-1937 (VSB), 2020 WL 1644009, at *12 (S.D.N.Y. Apr. 2, 2020) (citation omitted).

Repeating the claim raised in the amended complaint, ECF No. 14-3 at ¶¶ 29-30, Coleman alleges that he was not given the option of a body scan in lieu of a strip frisk. He appears to connect this to Martuscello's failure "to implement a directive regarding when and how to utilize body scanning equiptment [sic] as an alternative to degrading strip frisks," in contravention to 9 N.Y.C.R.R. § 7640. ECF No. 118-11 at ¶¶ 266-67. Nothing, however, in this regulation (9 N.Y.C.R.R. §§ 7640.1–7640.5) mandates that inmates must be given the option of a body scan in lieu of strip search. *See, e.g.*, ECF No. 118-11 at ¶¶ 232, 238. Nor is there is any such requirement in DOCCS' Directive No. 4910: Control of and Search for Contraband. ECF No. 14-3 at 161-68. For these reasons, and because Plaintiff was already provided an opportunity to state this claim, it is dismissed with prejudice.

Except for the November 22, 2024 strip frisks, Coleman does not allege facts suggesting that these strip frisks had a non-penological purpose. While Coleman contends that being forced to "spread [his] buttocks" constituted a sexual assault, ECF No. 118-11 at ¶ 297, this described search is consistent with a permissible strip frisk pursuant to Directive 4910. ECF No. 14-3 at 161 (defining a strip frisk as involving several possible procedures, including "bending over and spreading their buttocks to expose their anus[.]").

However, the back-to-back strip frisks conducted on November 22, 2024 by Cornmiller, Fitshans, and John Doe #3, where they "laughed" at Coleman, stared at his genitals, and/or forced him to remain naked and cold for over 30 minutes, ECF No. 118-11 at ¶ 259, suggest that these strip frisks were intended to humiliate

Coleman. He therefore has stated a colorable Eighth Amendment claim arising from the November 22, 2024 strip frisks against Cornmiller, Fitshans, and John Doe #3 that may proceed to service.

## VII.    Fourteenth Amendment

### A.    <u>Equal Protection</u>

To the extent that the second amended complaint asserts equal protection claims against Annucci for his purported failure to implement the HALT Act and against Martuscello for his strip frisk policy—it fails to state a claim. Coleman fails to plead facts suggesting that the strip frisk policy or his SHU confinement were discriminatory or that he was treated differently from other similarly situated inmates. *See Cromwell v. Hendel*, 20-CV-317-LJV, 2022 WL 16540353, at *4 (W.D.N.Y. Oct. 28, 2022) (dismissing equal protection claim where plaintiff has pled no facts to suggest that any defendant discriminated against him); *see also Green v. Martin*, 224 F. Supp. 3d 154, 171 (D. Conn. 2016) (dismissing an equal protection claim where the plaintiff failed to allege that he was treated any differently from another prisoner in the context of prison searches). Because the initial screening order identified these same deficiencies in Coleman's equal protection claims against Martuscello and Annucci and provided him with the opportunity to amend, these claims are dismissed with prejudice.

### B.    <u>Due Process</u>

#### i.    *The April 2024 Disciplinary Hearing*

Coleman alleges that on April 1, 2024, he was found guilty of charges stemming

from a retaliatory false misbehavior report by Tomporowski at a hearing presided over by Littlejohn. ECF No. 118-11 at ¶ 234. After Coleman told Littlejohn that the video of the March 18, 2024 incident underlying the misbehavior report was edited, Littlejohn wrote a different hearing tape number on the disposition. *Id.* at ¶ 235. Coleman believes that this was done "to cover-up" that an altered video was used at the hearing. *Id.* Littlejohn ultimately sentenced him to a loss of commissary, packages, and "static tablet" in violation of the HALT Act, which prohibits these limitations as a form of punishment. *Id.*

To state a cognizable § 1983 procedural due process claim, a plaintiff must allege facts demonstrating (1) that he possessed a protected liberty or property interest, and (2) that he was deprived of that interest without constitutionally sufficient due process. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *accord Bangs v. Smith*, 84 F.4th 87, 97 (2d Cir. 2023).

An inmate's liberty interest is implicated by prison discipline only if the discipline "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To determine whether an inmate's disciplinary confinement rises to the level of an atypical and significant hardship, both the conditions of that confinement and their duration must be alleged, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).

Constitutionally sufficient due process "afforded a prison inmate do[es] not equate to 'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). Inmates appearing at a disciplinary hearing must be provided with: (1) "advance written notice of the charges"; (2) "a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence"; (3) "a fair and impartial hearing officer"; and (4) "a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Id.* (citing *Wolff*, 418 U.S. at 563–67). While inmates do not have a right to counsel in disciplinary proceedings, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense." *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988).

### a.    *Littlejohn*

Coleman's allegations that Littlejohn intentionally used a doctored video—and subsequently covered up that use—to find Coleman guilty of the misbehavior report is sufficient to allege that he was deprived of an impartial hearing officer. At this stage, he has also sufficiently alleged that a liberty interest was implicated by the discipline he received, which was in violation of the HALT Act. This claim may therefore proceed to service against Littlejohn.

### b.    *Tomporowski*

Generally, "[t]he issuance of false misbehavior reports and provision of false testimony against an inmate by corrections officers is insufficient on its own to

establish a denial of due process." *Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005) (summary order) (citing *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997)). There are two exceptions to this general rule: "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015).

As alleged, Coleman was subjected to a false and retaliatory misbehavior report by Tomporowski that resulted in discipline without adequate due process. These facts allege a colorable due process claim that may proceed to service against Tomporowski for the allegedly false misbehavior report that led to the April 1, 2024 hearing before Littlejohn.

### ii.    *December 2024 Disciplinary Hearing*

Following the November 22, 2024 strip frisk, Coleman alleges that he received a misbehavior report and was found guilty of the charges in the misbehavior report "without being provided a free attorney[.]" ECF No. 118-11 at ¶ 261. After this determination was affirmed, Coleman appealed it to the Albany Supreme Court, where it remains pending. *Id.*

Coleman alleges that Annucci and Martuscello were deliberately indifferent in their failure to abide by the HALT Act and "due process which permits the plaintiff to be represented by an attorney." *Id.* at ¶ 293. He contends that the failure to provide him with an attorney resulted in his finding of guilt at six disciplinary hearings. *Id.* at ¶ 294.

"[T]here is no right to counsel . . . at prison disciplinary hearings." *Sira*, 380

F.3d at 69 (citing *Wolff*, 418 U.S. at 567-70). The HALT Act requires that:

> Persons at [disciplinary] hearings shall be permitted to be represented
> by any attorney or law student, or by any paralegal or incarcerated
> person unless the department reasonably disapproves of such paralegal
> or incarcerated person based upon objective written criteria developed
> by the department.

N.Y. Correct. Law § 137(6)(l).

While Coleman contends that Annucci and Martuscello failed to enact a policy

to "provid[e] indigent [inmates] an attorney[,]" ECF No. 118-11 at ¶ 294 (captioning

the claim, "Compulsion of Free Attorney's [sic]"), the HALT Act requires that inmates

be "permitted to be represented by" an attorney at a disciplinary hearing—not that

an inmate has the right to be provided with a free (*i.e.*, appointed) attorney. This

claim is therefore dismissed with prejudice.

## VIII.  HIPAA

Coleman alleges that on May 8, 2024, an unidentified individual conducted a

"cell-side sick call" in violation of his HIPAA rights. ECF No. 118-11 at ¶ 245. He

further alleges that sick calls were conducted in this fashion at the direction of

Wolcott, Raczkowski, and others. *Id.* at ¶ 303. "HIPAA, however, does not create a

private right of action and cannot support a claim under Section 1983." *Mendez v.*

*Quiros*, No. 3:16-CV-2097 (VAB), 2017 WL 374462, at *2 (D. Conn. Jan. 25, 2017)

(citing cases). Because amendment would be futile, this claim is dismissed with

prejudice.

## IX.    Conspiracy: 42 U.S.C. §§ 1985 and 1986

Coleman alleges that Fitshans, Cornmiller, and others "conspired with thousands of other [correction officers] and DOCCS employees to obstruct government administration pursuant to NY Penal Law § 195.05" by preventing "non-striking DOCCS employees from performing an official function by means of unlawfully striking[.]" ECF No. 118-11 at ¶ 314. He separately alleges that Martuscello and Annucci "separately conspired with . . . Noeth in creating unlawful directives as an act of discrimination towards [inmates] with disciplinary issues." *Id.* at ¶ 315.

"In order to state a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). Additionally, "[a] § 1985(3) conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.*[17] 42 U.S.C. § 1986 "imposes liability on an individual who has knowledge of discrimination prohibited under § 1985." *Graham*, 89 F.3d at 82.

---

[17] The Court does not interpret the second amended complaint to raise a claim under 42 U.S.C. § 1985(2), which bars conspiracies to obstruct justice in state judicial proceedings.

Initially, Coleman's claim that Defendants conspired to obstruct governmental administration in violation of NY Penal Law § 195.05, ECF No. 118-11 at ¶ 314, is likely barred by the fact that it is premised on a violation of state law. *See Sarner v. Caldwell-Boyd*, No. 3:21-CV-987 (JAM), 2022 WL 4132940, at *6–7 (D. Conn. Sept. 12, 2022) (interpreting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) to bar § 1985(3) conspiracy claims premised on state law and noting that "many other courts have ruled that a § 1985(3) conspiracy may not be premised on a conspiracy to deprive a plaintiff of the equal protection of state law").

In any event, Coleman's conclusory allegations of a conspiracy—lacking any discriminatory racial, ethnic, or class-based animus—are insufficient to state a conspiracy claim. Further, because the Defendants are all DOCCS employees, Plaintiff's conspiracy claims are barred by the intracorporate conspiracy doctrine, under which, "employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together." *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015). Given Coleman's *pro se* status and the fact that this claim was not previously raised, these claims are dismissed without prejudice.

## X. Administrative Procedures Act ("APA"): 5 U.S.C. § 706

Coleman argues that the failure of DOCCS to act on a number of his grievance violates the APA. ECF No. 118-11 at ¶ 316. Since "the APA only governs federal agencies, not state agencies[,]" any amendment would be futile. *Samuels v. New York*

*Dep't of Lab.*, No. 23-CV-8004 (LTS), 2025 WL 27737, at *9 (S.D.N.Y. Jan. 3, 2025). This claim is therefore dismissed with prejudice.

Additionally, "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures do[] not give rise to a cognizable § 1983 claim." *Shell v. Brzezniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005); *see Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (summary order) (the plaintiff's "claim that defendants violated his due process rights by restricting his access to the prison's grievance procedures confuses a state-created procedural entitlement with a constitutional right"). Consequently, "an inmate has no constitutional right to have his grievances processed or investigated in any particular manner." *Green v. Herbert*, 677 F. Supp. 2d 633, 639 (W.D.N.Y. 2010) (citation modified). Nor is there a "constitutional right of access to the established inmate grievance program." *Rhodes v. Hoy*, No. 9:05-CV-836, 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007), *case dismissed*, No. 9:05-CV-836, 2007 WL 1674093 (N.D.N.Y. June 7, 2007). Thus, to the extent Coleman raises this as a due process claim, ECF No. 118-11 at ¶ 317, it is also dismissed with prejudice.

## XI.   Class Action Certification

"Before an action may proceed as a class action . . . it must be certified as such by the Court." *Naum v. City of New York*, No. 94 CIV. 5747 (DAB), 1996 WL 140305, at *1 (S.D.N.Y. Mar. 28, 1996) (citing Fed. R. Civ. P. 23(c)(1)). To be certified as a class action, the requirements of Rule 23 must be met, including that "the

representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

*Pro se* litigants, however, "may not . . . represent the interests of third-parties," including other class members. *Rodriguez v. Eastman Kodak Co.*, 88 F. App'x 470, 471 (2d Cir. 2004) (citing *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998)); *Kimber v. Tallon*, 556 F. App'x 27, 28 (2d Cir. 2014) ("Generally, it is inappropriate for a *pro se* litigant to represent the interests of a class."). Since Coleman does not satisfy the requirements of Rule 23(a)(4), the Court denies his request for class certification, ECF No. 118-11 at ¶ 79, and will treat this as an individual action. *See McLeod v. Crosson*, No. 89 CIV. 1952, 1989 WL 28416, at *1 (S.D.N.Y. Mar. 21, 1989) ("It is well settled in this circuit that *pro se* plaintiffs cannot act as class representatives. They do not satisfy the requirements of Rule 23(a)(4).").

## ORDER

IT IS HEREBY ORDERED that Coleman's request for class certification, ECF No. 118-11 at ¶ 79, is DENIED without prejudice; and it is further

ORDERED that the Clerk of Court shall sever and transfer the claims arising from Coleman's confinement at Clinton and Midstate to the Northern District of New York. The severance and transfer shall include Defendants E. Castine, J. Friend, K. Guynup, Wrag Laporte, C. Lawfler, Adam Lord, Justin Mahan, J. Mullady, Zachary Buckley, Michael Moran, J. Newphew, N. Johnston, Brian Poupore, D. Bombardier, Austin Newell, Jim Vann, Stacey Manor, Torrin Fitten, C.O. Lamoy, Andrew Cymbrak, C. Gadway, Matthew Liberty, D. Mason, Terry Allen, Lt. Guynup, Earl

Bell, David Duquette, Kevin Santo, Gregory King, Chad Rodier, C.H.O. Liberty, John Doe ## 4, 7–10, Mark Passage, and Brian Hilton, Annucci, Martuscello, the Governor (Kathy Hochul), Noeth, and McGrath. Defendants Annucci, Martuscello, the Governor, Noeth, McGrath, and John Doe ##8-10 remain Defendants in this District from their conduct arising here; and it is further

ORDERED that the following claims, which arise from Coleman's confinement in this District may proceed to service:

▪ First Amendment retaliation claim against Tomporowski for the retaliatory misbehavior report that resulted in an April 1, 2024 finding of guilt at a disciplinary hearing;

▪ First Amendment free exercise of religion claim against Ebert;

▪ Eighth Amendment claim against Annucci arising from violations of the HALT Act in connection with Coleman's SHU confinement that began on August 10, 2022 at Attica;

▪ Eighth Amendment conditions of confinement claims against: (1) Tomporowski arising from Coleman's SHU confinement from August through September 2022; (2) Wolcott arising from the discharge of waste in April and May of 2024; (3) Annucci, Martuscello, Wolcott, Noeth, and John Doe Supervisor of Five Points arising from the alleged deprivation of out-of-cell activities and basic needs in contravention to the HALT Act while he was confined to the RRU; (4) Raczkowski, Tomporowski, Ford, Wolcott, and Cornmiller for deliberately utilizing a cell shield and housing Coleman in a cell with a moldy ceiling while in the RRU; (5) Martuscello

for implementing a deprivation order in the RRU that prevented the use of electricity in the cells; and, (6) Ford, John Doe #3, Ebert, Fitshans, and Cornmiller for the conditions of confinement that Coleman experienced from the start of the DOCCS's strike that began on February 28, 2025 until he was transferred from Attica to Midstate on April 16, 2025;

- Eighth Amendment sexual assault claim against Frederickson;

- Eighth Amendment deliberate indifference claim against John Doe #3 and Wolcott concerning Coleman's hunger strike;

- Eighth Amendment claims arising from the November 22, 2024 strip frisks by Cornmiller, Fitshans, and John Doe #3; and

- Fourteenth Amendment Due process claim again Tomporowski and Littlejohn arising from April 1, 2024 disciplinary hearing; and it is further

ORDERED that Coleman's remaining First Amendment retaliation claims, First Amendment access to court's claims, Fourth Amendment privacy claims, Eighth Amendment inadequate nutrition claims, remaining Eighth Amendment strip frisk claims, and Fourteenth Amendment Equal Protection claims are dismissed with prejudice; and it is further

ORDERED that Coleman's claims against DOCCS, the New York State Department of Mental Health, New York State Attorney General's Office, and New York State Governor's Office, as well as his claims against the individual defendants in their official capacity for monetary damages are dismissed without prejudice; and it is further

ORDERED that Coleman's First Amendment free exercise of religion claim arising from the strip frisks; Eighth Amendment claims arising from the use of restraints, excessive force, the alleged April 7, 2024 sexual assault, and deliberate indifference arising from being given the wrong medication on August 14, 2024; and, claims pursuant to 42 U.S.C. §§ 1985 and 1986, and claims arising from his confinement at Green Haven are dismissed without prejudice; and it is further

ORDERED that pursuant to *Valentin v. Dinkins*, the Court requests that the New York State Attorney General's Office ascertain the full name and last known address for Ebert, John Doe Supervisor of Five Points, Raczkowski, Ford, Cornmiller, John Doe #3, Fitshans, and Littlejohn and the last known address of Martuscello, Wolcott, Frederickson, and Noeth.[18] The Attorney General's Office need not undertake to defend or indemnify the defendant at this juncture. This order merely provides a means by which Coleman may name and properly serve them as instructed by the Second Circuit in *Valentin*.

The Attorney General's Office shall produce the information specified above within thirty days of the date of this Order by mail to the Pro Se Litigation Unit, United States District Court, 2 Niagara Square, Buffalo, NY 14202; and it is further

ORDERED that upon receipt of the *Valentin* response, the Clerk of Court is directed to cause the United States Marshals Service to serve copies of the summons, second amended complaint (ECF No. 118-11) and this Order upon Tomporowski,

---

[18] The Attorney General's Office has already provided service addresses for Tomporowski and Annucci. ECF No. 114.

Annucci, Ebert, Martuscello, Wolcott, Noeth, John Doe Supervisor of Five Points, Raczkowski, Ford, Cornmiller, Frederickson, John Doe #3, Fitchans, and Littlejohn without Coleman's payment therefore, unpaid fees to be recoverable if this action terminates by monetary award in Coleman's favor; and it is further

ORDERED that the Clerk of Court shall terminate the remaining defendants; and it is further

ORDERED that upon receipt of the summons and second amended complaint, Tomporowski, Annucci, Ebert, Martuscello, Wolcott, Noeth, John Doe Supervisor of Five Points, Raczkowski, Ford, Cornmiller, Frederickson, John Doe #3, Fitshans, and Littlejohn shall answer or otherwise respond; and it is further

ORDERED that the Clerk of Court is directed to send a copy of the second amended complaint, with exhibits, ECF No. 118, and this Order to Ted O'Brien, Assistant Attorney General in Charge, Rochester Regional Office, at Ted.O'Brien@ag.ny.gov, and he is directed to provide the *Valentin* information directed above; and it is further

ORDERED that, pursuant to Western District of New York Local Rule of Civil Procedure 5.2(d), Coleman must notify the Court in writing if his address changes. Failure to do so may result in dismissal of the action with prejudice.

SO ORDERED.

Date:         January 22, 2026
              Rochester, New York

HON. MEREDITH A. VACCA
UNITED STATES DISTRICT JUDGE

52